## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL No. 1:19-cr-10459-RWZ |
| | ) | |
| | ) | |
| ALVIN MOJICA | ) | |

### **DEFENDANT ALVIN MOJICA'S SENTENCING MEMORANDUM**

The Defendant in the above-captioned matter, Alvin Mojica, submits this memorandum, as well as the appended materials (attached as Exhibits A and B) in support of his request for a non-guideline sentence of time served, followed by three years of supervised release because that sentence is "'sufficient, but not greater than necessary,' to achieve the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007), as set forth in 18 U.S.C. § 3553(a).

On July 15, 2020, Mr. Mojica pleaded guilty to a single count of distributing cocaine in violation of 21 U.S.C. § 841(a)(1). The charges stem from a sale of approximately 13.6 grams of cocaine to a cooperating government witness on May 8, 2019.

### **BACKGROUND[1]**

Mr. Mojica is 32 years old and a life-long resident of Worcester. Although his parents were in an ongoing relationship when he was born, his father left the family when Mr. Mojica was five years old. From that point on, Mr. Mojica was supposed to spend his weekends with his father while his mother attended college classes, but those visits rarely happened because his father was either incarcerated or decided to leave Mr. Mojica with his paternal grandparents while he went out. When Mr. Mojica's father actually spent time with his son during those

---

[1] This background has been compiled based on a number of interviews with both Mr. Mojica and his mother, as well as other collateral interviews.

weekends, his presence proved to be a destructive force in Mr. Mojica's life.  In addition to his attempts to poison Mr. Mojica's relationship with his mother, Mr. Mojica's father introduced him to both marijuana and alcohol.  According to Mr. Mojica, he first drank alcohol and smoked marijuana with his father when he was around nine years old.  His father's lack of support also had detrimental effects on Mr. Mojica's day-to-day living conditions.  Although his mother worked hard to support the family, including Mr. Mojica's younger sister, the family was required to live in public housing and moved several times throughout his childhood.

As a result of his father's negative influence, Mr. Mojica began rebelling against his mother's attempts to provide structure and discipline in his life.  This rebellion included acting out in school with disruptive behavior.  Although Mr. Mojica did well academically, his conduct in the school detracted from his ability to be in the classroom on a regular basis.  Eventually, this distracting conduct resulted in the school recommending an in-patient psychiatric evaluation.  According to Mr. Mojica and his mother, he was hospitalized for approximately one month in a mental health unit at a hospital in Norwood, Massachusetts.  Mr. Mojica recalls being strapped down repeatedly during this hospitalization and reports that it was a very traumatic experience.  While he was hospitalized, he was diagnosed as being clinically depressed and was discharged to outpatient counseling.  Although Mr. Mojica did participate in some counseling in the years that followed his hospitalization, he was never prescribed any medications of any kind.

According to his mother, in his teenage years, the scope of Mr. Mojica's behavioral problems escalated again, and she lacked the ability to provide regular supervision because of her work obligations.  Eventually, he was committed to the custody of the Massachusetts Department of Youth Services ("DYS") for an assault with a dangerous weapon that occurred when he was 14 years old.  While he was in DYS custody, Mr. Mojica earned his GED and

started individual counseling, where he gained insight into the dysfunctional relationship with his father and the effect that had on his behavior with his mother.

After his release from DYS custody, Mr. Mojica returned to live with his mother and sister and was making important strides towards improving his life. He enrolled in a pre-veterinary program at a Tufts University campus in Leicester, Massachusetts. However, when he learned that his girlfriend at the time, Marta Molina, was pregnant, he moved out of his mother's house and dropped out of the program to work to support his daughter. The years that followed found Mr. Mojica falling into old familiar patterns of self-destructive behavior that resulted in a number of arrests and periods of incarceration. After he was released from state prison, Mr. Mojica again made positive strides. In addition to continuing to support his daughter, as well as his son, who was born in 2017, Mr. Mojica enrolled in the Bridging Pathways Apprenticeship Program in 2018. He attended classes on a daily basis as part of that program and trained to become a carpenter's apprentice. He graduated from the Bridging Pathways Program as a carpenter's apprentice and found work with Local 336 in Worcester before he was incarcerated. *See* Bridging Pathways Certificates, *attached as* Exhibit A.

## ARGUMENT

The sentence proposed by Mr. Mojica of time served, followed by three years of supervised release is "sufficient, but not greater than necessary, to comply with the purposes of sentencing." 18 U.S.C. § 3553(a). The First Circuit elaborated on the meaning and breadth of the so-called parsimony principle in *United States v. Yonathan Rodriguez*, 527 F.3d 221 (1st Cir. 2008). In *Rodriguez*, the First Circuit stressed that the Supreme Court ruling in *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an

overarching principle." *Id.* at 228.  That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id.*  In reaching a decision on what constitutes an appropriate sentence, a court should "consider all the relevant factors" and "construct a sentence that is **minimally** sufficient to achieve the broad goals of sentencing." *Id.* (emphasis added).

A.  Nature and Circumstances of the Offense

There is no dispute that the conduct Mr. Mojica engaged in was serious, and he agrees with the Probation Department that the advisory guideline range in this case is 15-21 months. *See* PSR at ¶ 113.  Mr. Mojica has consistently and repeatedly recognized that his behavior in this case was wrong.  There can also be no doubt that he exhibited bad judgment in agreeing to sell the cocaine that he sold to the cooperating witness.  However, it is important to note that, at the time of this offense, Mr. Mojica was out of work while he was waiting to be hired on for a new project with the carpenter's union and was struggling to provide financial support to his two children.  While that certainly does not excuse the poor decision he made, it does provide some context regarding the circumstances he was in at the time.  Mr. Mojica carries with him vivid memories from his childhood of having a father who did not provide support for his family, either financially or emotionally, and his actions were at least partially motivated by a desire not to fall into that familiar pattern with his own children.  Unfortunately for Mr. Mojica, his actions ultimately led to his incarceration in connection with this offense, which he certainly understands only exacts even greater deprivations in his children's lives because it robs him of his ability to be physically present for his children.

B.  History and Characteristics of Mr. Mojica

Mr. Mojica's life has been marked by instability and numerous setbacks that have impeded any linear progress. He has overcome a difficult childhood that was irretrievably

fractured when his father abandoned the family and his parental responsibilities when Mr.

Mojica was five years old.  Mr. Mojica's only childhood interactions with his father after his

parents' separation were destructive.  His father introduced him to alcohol and drug use at an

astoundingly young age, and actively worked to undermine Mr. Mojica's relationship with his

mother and the structure and discipline she tried to provide.  Mr. Mojica's conduct in school

suffered as a result and his academic progress was derailed by disciplinary issues that also

necessitated numerous moves from one school to another.  This instability was further

exacerbated by the economic insecurity that the family had to work through because Mr.

Mojica's mother lacked any financial support from his father.  Despite experiencing periods of

relative steadiness and personal growth, Mr. Mojica eventually found himself struggling to

support a family of his own while unfortunately repeating the same types of conduct that his own

father modeled when Mr. Mojica was a child, which inevitably ended with Mr. Mojica's

incarceration for periods of time.

Despite these struggles, Mr. Mojica had, prior to his incarceration, started to enact

positive changes in his life.  He has identified and trained for a trade that will provide him and

his two children with a good living, completing an apprenticeship course where he was able to

make positive, lasting connections with a local carpenter's union.  What is also apparent is that

Mr. Mojica also has strong personal connections and familial relationships on which he can rely

once he is released from custody.  As the attached letters of support make plain, Mr. Mojica is a

dedicated and supportive father and brother, who cares deeply about being in a position to help

his children succeed.  *See* Letters of support from Cynthia Montanez, Yamelet Mojica, Marta

Molina, and Sheila Pagan, *attached as* Exhibit B.  Mr. Mojica understands that continuing to

engage in the type of conduct that he pleaded guilty to, which results in his incarceration,

deprives his children of his guidance and support.  He also acknowledges that it is especially

crucial that he be present for his daughter as she enters her teenage years.  Given her age and

maturity, Mr. Mojica has been straightforward and honest with his daughter about his

involvement in this offense and has not tried to insulate her from his actions.  Rather, he has tried

to make sure that she understands the consequences of his actions in the hopes of ensuring that

she will not make the same types of poor decisions.

   C.  <u>Adequate Deterrence of Criminal Conduct to Protect the Public</u>

   The period of incarceration that Mr. Mojica has already experienced in this case has had a

profound effect on him and will certainly deter him from engaging in future unlawful conduct.

As this Court is aware, Mr. Mojica was infected with COVID-19 while he was detained pre-trial

at the Wyatt Detention Facility.  Experiencing the tremendous levels of anxiety caused by that

diagnosis and the fears that he would die alone and isolated from his family has left an indelible

mark on Mr. Mojica.  This experience will act as a constant reminder of the risks that he would

run if he were to commit an offense that would result in any involvement with the criminal

justice system in the future.  With the lingering memory of his illness, as well as the insight he

has gained regarding the destructive impact of his incarceration on his children's lives, not only

is Mr. Mojica no longer a threat to his community, but indeed he shows substantial indicia of

being capable of being an asset to it.  *See United States v. Myers*, 353 F.Supp. 2d 1026 (S.D.

Iowa 2005) (court departed from a guideline range of 20-30 months to 3 months' probation

based on diminished deterrent value of imprisonment based on characteristics of the defendant).

Mr. Mojica has begun to exhibit a comprehensive understanding of the course his life needs to

take from this point forward.  Consequently, a sentence that does not require any further

incarceration would allow Mr. Mojica to resume his role in the lives of his children and to regain the foothold he needs to contribute positively to his community.

D.  <u>The Risks Posed by Additional Incarceration</u>

This Court must also consider the COVID-19 pandemic in fashioning an appropriate sentence in this case.  As this Court is undoubtedly aware, COVID-19 has been disproportionately impacting communities of color and poorer communities.  Crystal Watson, *et al.*, *COVID-19 and the US Criminal Justice System: Evidence for Public Health Measures to Reduce Risk*, JOHNS HOPKINS CENTER FOR HEALTH SECURITY AND THE JOHNS HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH DEPARTMENT OF ENVIRONMENTAL HEALTH AND ENGINEERING (October 2020), at 4 (hereinafter *COVID-19 and the US Criminal Justice System*). Latinx people have hospitalization rates that are 4 times higher than their white counterparts, while Black, Native American, and Alaska Native people have hospitalization rates that are 5 times higher than white people in the United States.  *Id.* at 5.  Social inequalities also contribute to conditions that increase the risk of exposure to COVID-19.  *Id.*  For example, marginalized populations are more likely to fill essential jobs that require them to leave their homes for work, and, in many cases, these workers lack access to sufficient personal protective equipment (PPE), increasing their risk of exposure.  *Id.*  Socioeconomically disadvantaged populations are also more likely to experience homelessness, unstable, low-quality, or densely populated housing, all of which increase the risk for COVID-19 transmission.  *Id.*

Moreover, higher rates of underlying conditions that contribute to more severe disease outcomes are all more prevalent in poor and minority communities. Obesity, diabetes, and cardiovascular disease are all risk factors for severe disease, and these conditions disproportionately affect Black, Latinx, Indigenous, and migrant populations.  *Id.*  In Jack

Shonkoff and David Williams, *Thinking About Racial Disparities in COVID-19 Impacts Through a Science-Informed, Early Childhood Lens*, HARVARD UNIVERSITY CENTER ON THE DEVELOPING CHILD (April 27, 2020),[2] the authors note that:

> there is increasing evidence that health threatening conditions early in life-including poor nutrition, exposure to pollutants, and excessive family stress associated with poverty, racism, and other forms of economic or social disadvantage-can have disruptive effects on developing immune and metabolic systems that lead to greater risk for a variety of chronic health impairments well into the adult years.
>
> [….]
>
> The structural legacies of racism and other cross-generational traumas may be linked to levels of chronic stress that increase susceptibility to the kinds of health impairments that result in greater risk of harm from COVID-19. Evidence is also mounting that the origins of these common diseases are affected by significant adversity during the prenatal period and first 2-3 years after birth.

Thus, sentencing Mr. Mojica to more time in jail will expose him to a greater risk not only of contracting COVID-19 again, but of suffering a severe, and possibly lethal, form of it.

Mr. Mojica's risk of contracting COVID-19 will undoubtedly be higher if this Court sentences him to additional time in prison.  That is because, not only does the Bureau of Prisons ("BOP") forbid inmates from having access to hand sanitizer, despite CDC recommendations to prisons to the contrary,[3] but social distancing is impossible while incarcerated; soap is rationed, and, inmates are not provided with supplies to adequately disinfect their cells.  *COVID-19 and the US Criminal Justice System*, *supra,* at 15.  As a result, the rate of infection in jails and prisons has far outstripped the rate in the country at-large.  As of June 6, 2020, the COVID-19 case rate in prisons was 5.5 times higher and the age-adjusted death rate was 3 times higher than that of the overall US population.  *Id.* at 11.  COVID-19 outbreaks also grow faster in carceral

---

[2] *Available at* https://developingchild.harvard.edu/thinking-about-racial-disparities-in-covid-19-impacts-through-a-science-informed-early-childhood-lens/.
[3] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

facilities: The average daily growth rate of cases between March 1, 2020, and June 6, 2020, was 8.3% in prisons compared to 3.4% in the general US population.  *Id.*

This general trend regarding the risk of COVID-19 infection while incarcerated has certainly been borne out in Mr. Mojica's case.  As mentioned above, Mr. Mojica has already contracted COVID-19 before, while he was detailed pre-trial at the Wyatt Detention Facility.  On April 24, 2020, Mr. Mojica tested positive for the virus and was quarantined.  Mr. Mojica's infection was part of the first outbreak that occurred at Wyatt.  Since then, there have been multiple other inmates who have tested positive at Wyatt and, just recently, another large outbreak at the facility involving at least 52 inmates and 8 staff members.  *See In re: Donald W. Wyatt Detention Facility*, Status Report, Docket No. 1:20-mc-00004-JJM (October 19, 2020).

This new outbreak at Wyatt is consistent with the rising number of COVID-19 cases in the United States at large.  Cases in this country have re-surged to much higher levels over the past few months, because as economic activity has resumed, viral transmission has also increased, and epidemics have accelerated in various regions of the country.  *See COVID-19 and the US Criminal Justice System*, *surpa*, at 6.  While it is not possible to conclusively predict the trajectory of the pandemic, whether the virus continues to spread will depend on the willingness of political leaders at the national and state levels to control transmission through social distancing interventions, including business closures and stay-at-home orders, and public health measures to identify cases through rigorous testing, isolation of cases, contact tracing, and quarantine of contacts of cases to break chains of transmission, as well as adherence of the population to those public health measures.  *Id.* at 7.

The fact that Mr. Mojica has already contracted the virus and recovered does not mean that he does not risk being re-infected.  Current research suggests that COVID-19 immunity will

last at least three months in most cases, but it is not clear how much the immunity extends beyond that period.  *Id.* at 4.  Studies also seem to indicate that individuals who previously had severe cases of COVID-19 have a stronger and longer-lasting immunity to SARS-CoV-2 infection than individuals with milder illness.  *Id.*

In Mr. Mojica's case, he suffered from relatively mild symptoms the first time he contracted COVID-19 at Wyatt, including fatigue, muscle aches and a cough, which suggests that his immunity to the virus may be shorter lived than if he had more severe symptoms. Additionally, Mr. Mojica suffers from asthma, which requires treatment with an albuterol inhaler, and the latest guidance from the Center for Disease Control and Prevention indicates that individuals with asthma "might be at an increased risk for severe illness from the virus that causes COVID-19."  Center for Disease Control and Prevention, *People with Certain Medical Conditions*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical conditions.html?CDC_AA_refVal=https%3A%2F%2F www.cdc.gov %2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last updated Oct. 16, 2020).

Thus, in determining whether to sentence Mr. Mojica to additional time in prison, this Court should include in its calculus the significant risk that he may contract COVID-19 again and that he may experience a very bad outcome from being re-infected given his underlying health condition.  Given the current pandemic and the health risks posed by further incarceration, as well as all of the other factors listed above, Mr. Mojica respectfully requests that this Court depart from the guidelines and impose a time served sentence with three years of supervised release to follow.

## **CONCLUSION**

For all of the reasons outlined above, the Defendant respectfully requests that this Court

sentence him to time served with three years of supervised release.


Respectfully Submitted,
ALVIN MOJICA,
By His Attorney,

/s/ *Darren Griffis*
Darren T. Griffis, Esq., BBO #675627
Glickman, Sugarman, Kneeland &
      Gribouski
11 Harvard Street
Worcester, MA 01609
(508) 756-6206
Date:   October 22, 2020      griffis@gskandg.com




## **CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of the within Motion by way of the ECF
system, which was sent electronically to the registered participants as identified on the
Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-
registered participants on the 22nd day of October, 2020.

/s/ *Darren Griffis*
Darren Griffis